UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
NANOPIERCE TECHNOLOGIES, INC.,   :
   :
         Plaintiff,   :
   :
   :   **<u>OPINION</u>**
   :   02 Civ 0767 (LBS)
         v.   :
   :
SOUTHRIDGE CAPITAL   :
MANAGEMENT, et al.,   :
   :
         Defendants.   :
-----------------------------------------------------------x

SAND, J.,

     Before the Court are three motions for summary judgment pursuant to

Rule 56(c) of the Federal Rules of Civil Procedure. The three motions are

addressed in the following order:  first, the motion for summary judgment filed by

Harvest Court (a co-defendant and subsidiary of Southridge); second, the motion

for summary judgment filed by Counterclaim-Plaintiffs Kampmann and

Metzinger (Nanopierce executives); and third, the motion for summary judgment

filed by H. Glenn Bagwell, Jr.  For the reasons stated below, Harvest Court's

motion for summary judgment is granted, Kampman and Metzinger's motions for

summary judgment are denied with respect to Counts 1, 7, 8, and 13, and granted

with respect to Count 9. Bagwell's motion for summary judgment is denied.


## I.  Background[1]

---

[1] For a fuller statement of the background of this litigation, <u>see</u> <u>Nanopierce Techs., Inc. v.</u>
<u>Southridge Capital Mgmt. LLC</u>, 02 Civ. 767 (LBS), 2004 U.S. Dist. LEXIS 24168, 2-3 (S.D.N.Y.
Dec.2, 2004); <u>Nanopierce Techs., Inc . v. Southridge Capital Mgmt. LLC</u>, 02 Civ. 767 (LBS),

In a September 26, 2000, meeting at defendant Southridge's office, Nanopierce President Paul Metzinger negotiated an agreement with two Southridge employees, Defendants Singer and Pickett.[2] The negotiated agreement between Southridge and Nanopierce called for $ 7.5 million in initial financing in exchange for approximately 4.5 million shares of Nanopierce stock. The agreement also contained a provision providing "reset rights," which entitled the Southridge to additional shares of common stock in the event the stock price declines. The reset clause included three reset dates (at 65, 130, and 195 days after the closing) at which additional shares would be issued if the stock was trading below the initial purchase price. Finally, the agreement also provided for an additional $ 7.5 million in financing at a future date, on the condition that Nanopierce's stock met certain price and volume thresholds.

After the agreement was signed,[3] for approximately six months, until May 9, 2001 Defendants sold its Nanopierce stock nearly every day, accounting for 22.7% of the traded volume over the entire period. The stock price, which had closed at $2.63 on October 23, 2000, dropped steadily, reaching a low of $ 0.32 in April 2001, and closing at $ 0.51 on May 9, 2001. After the first reset date, Defendants requested, and Nanopierce issued, 2,143,975 reset shares pursuant to

2003 U.S. Dist. LEXIS 21858 (S.D.N.Y. Dec. 4, 2003); Nanopierce Techs., Inc . v. Southridge Capital Mgmt. LLC, 02 Civ. 767 (LBS), 2003 U.S. Dist. LEXIS 21854 (S.D.N.Y. Dec. 4, 2003); Nanopierce Techs., Inc . v. Southridge Capital Mgmt. LLC, 02 Civ. 767 (LBS), 2003 U.S. Dist. LEXIS 21848 (S.D.N.Y. Dec. 4, 2003); Nanopierce Techs., Inc . v. Southridge Capital Mgmt. LLC, 02 Civ. 767 (LBS), 2003 U.S. Dist. LEXIS 15206 (S.D.N.Y. Sept. 2, 2003); Nanopierce Techs., Inc . v. Southridge Capital Mgmt. LLC, 02 Civ. 767 (LBS), 2003 U.S. Dist. LEXIS 11108 (S.D.N.Y. June 30, 2003); Nanopierce Techs., Inc . v. Southridge Capital Mgmt. LLC, 02 Civ. 767 (LBS), 2002 U.S. Dist. LEXIS 24049 (S.D.N.Y. Oct. 10, 2002).
[2] The facts as set forth in this opinion are drawn from the undisputed facts in the parties' submissions.
[3] Defendant Harvest Court, a subsidiary of Southridge, is the signatory on the agreement.

the formula. However, on the second reset date, April 30, 2001, Nanopierce refused to issue an additional 7,418,895 shares, and indicated that it would issue no further (reset) shares in the future.

Nanopierce filed a Complaint against Southridge and Harvest Court, alleging that Defendants manipulated the price of its stock, and that this incident was part of a pattern pursuant to which Defendants inserted conversion and reset provisions into financing agreements with other companies, and then proceed to drive down the stock price via dumping, short sales, and other means. Harvest Court initiated its own action against Nanopierce, alleging that Harvest Court had been fraudulently induced into entering the agreement by a series of misrepresentations by Nanopierce. Harvest Court subsequently recast those claims as counter- and third-party claims in this action. This Court addressed a number of motions to dismiss in 2002 and 2003 (see infra, footnote 1), and now the parties have filed motions for summary judgment with respect to the remaining claims.

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). This occurs when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed.

2d 538 (1986)). "A fact is 'material' for these purposes if it might affect the outcome of the suit under the governing law. An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz, 258 F.3d at 69 (internal quotations and citations omitted).

## III. Harvest Court's Summary Judgment Motion

The motion for summary judgment filed by Harvest Court relies on two arguments. First, Harvest Court contends that Nanopierce is not legally entitled to rely on oral representations (assuming that any were made) when those representations were not included in the contract between the parties, and the contract itself contained a merger clause. Second, Harvest Court argues that the Second Circuit's decision in ATSI Communications, Inc. v. Shaar Fund, Ltd, 493 F.3d 87 (2d Cir. 2007), precludes liability for death spiral financing as a matter of law, unless some other manipulative behavior accompanies it. This Court finds Harvest Court's second argument persuasive. Because this Court agrees that the Second Circuit's ATSI decision precludes liability, Harvest Court is entitled to summary judgment.

## A. The ATSI Decision

In this Court's 2002 decision denying Defendants' motion to dismiss, the Court noted that the "law of the Second Circuit on so-called open-market manipulation… is not yet fully settled." (10/10/02 Opinion at 13). Defendants argue that in the intervening years, however, the Second Circuit has settled the question of whether open-market sales, accompanied by a subjective intent to

affect the price of a stock, could constitute market manipulation. And, in <u>ATSI</u>, the Second Circuit concluded that it was not.

The <u>ATSI</u> case is very similar to the conduct at issue in <u>Nanopierce</u>. <u>See</u> <u>ATSI</u>., 493 F.3d at 96. Like Nanopierce, the defendants in <u>ATSI</u> were accused of taking advantage of a struggling company by negotiating a "death spiral" financing deal. Once the contract was arranged, defendants sold their stock short in large volumes, driving down the price. Further, as here, the defendant was alleged to have had a pattern of engaging in this type of financing deal, with many of the companies it financed going bankrupt as an alleged result.

The Second Circuit held that allegations of death spiral financing were insufficient, standing alone, to defeat a motion to dismiss. The Court held that a defendant would need to "inject[] inaccurate information into the marketplace or create a false impression of supply and demand for the security… for the purpose of artificially depressing or inflating the price of the security." <u>ATSI</u> at 101. The Third Circuit, in a case endorsed by the Second Circuit in <u>ATSI</u>, noted that "increasing the supply of stocks by selling them on the open market in legitimate transactions to real buyers does not *artificially* affect prices and therefore cannot be manipulative." <u>GFL Advantage Fund Ltd. v. Colkitt</u>, 272 F.3d 189, 210 (3d Cir. 2001).

Notably, <u>ATSI</u> rejects a number of the factors that Nanopierce relies on to demonstrate market manipulation. For instance, short selling alone is not enough. <u>ATSI</u> at 101 ("To be actionable as a manipulative act, short selling must be willfully combined with something more to create a false impression of how

market participants value a security.").  Similarly, "death spiral" financing agreements are also not, even when combined with short selling, inherently manipulative.  <u>Id.</u> ("Such securities provide distressed companies with access to much-needed capital and, so long as their terms are fully disclosed, can provide a transparent hedge against a short sale.").

The Second Circuit has spoken clearly about the principle that "[a] strong inference of scienter [sufficient to defeat a motion to dismiss] is not raised by alleging that a legitimate investment vehicle, such as the convertible preferred stock at issue here, creates an opportunity for profit through manipulation."  <u>Id.</u> at 104.  Such an allegation, standing by itself, is insufficient to defeat a motion to dismiss; it is certainly insufficient to defeat a motion for summary judgment.

Further, the Second Circuit emphasized the fact that these agreements are negotiated by sophisticated parties who are aware of the potential consequences.  The Court noted that there was a "plausible nonculpable explanation" for the defendants' actions, which was that "ATSI and the defendants simply entered into mutually beneficial financing transactions."  <u>Id.</u> at 104.

The facts in this case clearly demonstrate that Nanopierce understood the terms of the agreement, and knew that Harvest Court was not a long-term investor.  One executive sent a letter to Nanopierce's shareholders several months after the deal closed, which noted that "in bad market conditions, these types of financing can have an unfavorable dilutive impact and exert a depressant effect on the price of the Company's stock.  We are conducting numerous discussions with many other financial sources that we believe will provide more favorable

financing to the Company with less adverse features." (3/7/01 Shareholder Letter,

p. 4). Further, deposition testimony by Nanopierce executives demonstrates that

they knew Harvest Court was not a long-term investor.[4] See Schrader Aff Exh.

41, Richards 10/14/02 Dep. at 173 ("Mr. Pickett said, as you know, that we are

not long time investors ourselves and we may sell our stock."); Schrader Aff Exh.

41, Richards 10/14/02 Dep. at 166 ("we got out in the car and I said to Paul, can

you believe this, they didn't even want to know what the company did, nothing,

its [sic] like getting a gift from heaven, you know, okay, and we needed the

money, okay?"). Nanopierce cannot reasonably have expected that an investor

who "didn't even want to know what the company did" would be a long-term

investor in the company's stock. Nanopierce clearly "needed the money," and

knew of the potential "unfavorable" and "depressant" effect that the financing

could have on the company's stock.

Nanopierce argues that Harvest Court's activities were improper because

its investment carried no risk. See. Pl.'s Opp. Br. at 10 ("Selling the stock as

[Harvest Court] did in order to lower the price and reap additional reset shares –

at no cost – virtually insured Harvest Court an astronomical rate of return, and an

opportunity to double its money. Such a return without risk is not an investment –

it's a scheme."). But Nanopierce vastly overestimates the certainty involved with

this investment strategy. Harvest Court was investing in a very distressed

company, as is evidenced simply by the fact that Nanopierce agreed to the "death

---

[4] Nanopierce argues that Harvest Court's lack of due diligence demonstrates that Harvest Court never intended to be a long-term investor in Nanopierce's stock. But, indeed, if this is true, then Nanopierce must have known by virtue of the lack of due diligence by Harvest Court that its intention was *not* to hold the stock.

spiral" financing at all (presumably, a company that was able to obtain any other sort of financing would prefer to avoid such a contract).

Harvest Court was subject to several risks inherent in this transaction. First, the structure of the agreement only provided protection for one-third of Harvest Court's stock in every reset period. If Harvest Court failed to liquidate one-third of its stock in each reset period, that leftover stock would lose the reset provision protection and Harvest Court would be left with unprotected shares in a financially distressed company. Similarly, Harvest Court faced the risk that Nanopierce would go bankrupt during the reset provision, in which case it could lose its $7.5 million investment entirely. For a company whose auditor had expressed doubts about its survival as a "going concern," this was far from a risk-free transaction.

Thus, the Second Circuit has held that a death-spiral financing agreement, without more, is not inherently manipulative. Since Nanopierce has not provided evidence to show that Harvest Court's behavior was inherently manipulative, Harvest Court's motion for summary judgment should be granted.


B. Southridge's Alleged False Statements

To prevail on its 10b-5 and common law fraud claim, Nanopierce must demonstrate that, in offering to buy its securities, Southridge made a false statement or omitted a material fact, on which Nanopierce relied, causing injury and damages. Halperin v. Ebanker USA.Com, Inc., 295 F.3d 352 (2d Cir. 2002).

Nanopierce must also prove evidence of manipulative activity to succeed on its market manipulation claim.

Nanopierce claims that Southridge made several misrepresentations, none of which are included in the final negotiated contract. First, Nanopierce claims that Harvest Court was obligated to provide an additional $7.5 million of funding if Nanopierce's stock met certain volume and price thresholds. (Def. Br. at 4). This provision, however, was contained in the Purchase agreement, and there is no evidence that Harvest Court would have refused to comply with it. The obligation did not arise under the terms of the Purchase Agreement until after this lawsuit had already been initiated, and after Nanopierce had failed to honor the reset provision.

Second, Nanopierce claims that Harvest Court represented that it would not "manipulate" Nanopierce's stock. This representation is not included in the Purchase Agreement, and thus cannot be considered a term of the agreement. The Purchase Agreement contains a merger clause, and in a transaction between sophisticated parties, the Court should not look beyond the terms of the contract if the parties intended the contract to be the complete and final terms of the agreement. Global Intellicom v. Thomson Kernhagen & Co., 99 Civ. 342, 1999 WL 544708 (S.D.N.Y. July 27, 1999). Thus, Nanopierce was not entitled to rely on this representation.

Third, Nanopierce contends that certain facts about Southridge were false, namely that it "had been in business since 1993, managed four hundred million dollars in assets, and owned its own building." (Compl. at ¶ 32(d)). Nanopierce

has not produced any evidence to demonstrate that these representations were false. (Def. Br. at 5).

Finally, Nanopierce claims that Harvest Court failed to disclose several material facts that would have indicated that Harvest Court intended to manipulate Nanopierce's stock. Specifically, Nanopierce claims that Harvest Court failed to disclose that it "intended to manipulate and drive down Nanopierce's stock price through short selling and other techniques, in order to obtain additional shared of stock and control of Nanopierce." (Compl. at ¶ 34(a)). Also, Nanopierce claims that Southridge failed to disclose its intend to avoid providing the second installment of financing, that it intended to take control of Nanopierce, that Southridge had a pattern and practice of manipulating the stock price for distressed companies for which it provided financing, and that a New York jury had found that one of the Southridge entities had breached its duty of good faith by manipulating a company's stock.[5] (Def. Br. at 5-6). Since this behavior cannot form the basis for market manipulation after <u>ATSI</u>, as discussed above, Nanopierce's argument fails.

## C.  Singer

In Harvest Court's motion for summary judgment, it also asserts that defendant Singer should be granted summary judgment. Signer worked at Southridge from January 2000 to April 2003 as a credit analyst. Singer was

---

[5] This characterization of the jury verdict is somewhat misleading, however, because the jury that found against Southridge was overruled by the Court in that case, and the Court's decision was affirmed on appeal. <u>Haymarket LLC v. D.G. Jewellery of Canada Ltd.</u>, 290 A.D.2d 318 (1st Dept. 2002).

present at an initial meeting between Metzinger and Richards, and assisted in analyzing Nanopierce's creditworthiness using publicly available information, but had no role in the agreement beyond that, and did not assist in negotiating the agreement. (Def. Br. at 19).

Plaintiffs contest the extent of Singer's involvement in the transaction, and assert that Singer knew and did not disclose to Nanopierce the fact that Southridge was mainly interested because of Nanopierce's "ready reservoir" of tradable stock and high liquidity. (Pl.'s Opp. at 18). Essentially, though, Plaintiff's allegations against Singer are that she knew of Southridge's plan to sell the stock and failed to disclose that information to Nanopierce. Thus, Singer's motion for summary judgment should be granted for the same reasons as Harvest Court's motion, as outlined above.[6]

## E. Summary Judgment against H. Glenn Bagwell

Counterclaim-Defendant H. Glenn Bagwell argues that Harvest Court has not sufficiently alleged and proved the elements for a breach of contract claim, and argues that summary judgment should be denied. In making this argument, Bagwell largely reiterates arguments made when this Court considered the motions to dismiss in this case. This Court wrote:

> Court already noted Bagwell disputes whether the Lock-Up Agreement was 'a valid and binding contract,' or merely 'an agreement to agree,' in that it contemplated the adoption of an Escrow Agreement in the future. He also argues that the Lock-Up Agreement 'is between NPCT and

---

[6] Plaintiff also claims that Singer "led Nanopierce to believe that Southridge was conducting due diligence on the company as a true investor." (Pl. Br. at 18). But it is clear, as described above, that Nanopierce knew that Southridge and Harvest Court were not long-term investors, so this allegation fails.

Gemini, not NPCT, Gemini and Bagwell as Harvest contends.' Bagwell did, however, sign the Lock-Up Agreement on a signature line reading 'Appointment as Escrow Agent Accepted', which could easily have resulted in a binding agreement, to which he was a party, to the effect that he would act as an escrow agent for the locked-up shares.

Bagwell contends, again, that no contract was formed for the escrow agreement, because Gemini announced its non-performance before the escrow agreement could be drafted. But, again, Bagwell signed the Lock-Up Agreement and committed to being an escrow agent, which would satisfy the standards for a valid contract.

Second, Bagwell contends that the non-performance by both parties to the escrow agreement voids Harvest Court's breach of contract claim. But Bagwell's argument mischaracterizes the nature of Harvest Court's claim. Harvest Court is suing based on Bagwell's signature on the Lock-Up agreement, in which he agreed to act as escrow agent. Harvest Court's cause of action is brought as a third party beneficiary to that agreement, not as a performing party under the contract. The elements, therefore, that Harvest Court is obligated to allege and prove, are different. "It is ancient law in New York that to succeed on a third party beneficiary theory, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." County of Suffolk v. Long Island Lighting Co., 728 F.2d 52, 63 (2d Cir. 1984). "A party asserting rights as a third-party beneficiary must establish '(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a

duty to compensate him if the benefit is lost.'" <u>Affordable Hous. Found., Inc. v.</u>

<u>Silva</u>, 469 F.3d 219, 251 (2d Cir. 2006) (quoting <u>State of Cal. Pub. Employees.</u>

<u>Ret. Sys. v. Shearman & Sterling</u>, 95 N.Y.2d 427, 434-35, 741 N.E.2d 101, 718

N.Y.S.2d 256, 259 (2000)).  Harvest Court has shown that the Lock-Up

agreement was intended to keep the Gemini shares off the market while it sold the

stock that it received from the Purchase Agreement.  This benefit, of a more

limited market for the Nanopierce shares, was lost when the Lock-Up agreement

was breached.  Harvest Court has demonstrated the necessary factors for bringing

suit as a third party beneficiary, thus, Bagwell's argument to defeat summary

judgment must fail.


**III. Kampmann and Metzinger's Motion for Summary Judgment**

   Counterclaim-Defendants Kampmann and Metzinger have also filed a

motion for summary judgment on all of Harvest Court's counterclaims.  Harvest

Court makes the following claims, excluding any that were dismissed in the 2003

motion to dismiss opinion.   First (Count 1), Harvest Court brings a 10(b)(5) claim

for failure to disclose material information about Metzinger's background and the

Gemini warrants, described below.  Second (Count 7), a control person liability

claim under § 20 of the Securities Act.  Third (Count 8), a common law fraud

claim.  Fourth (Count 9), a breach of fiduciary duty claim resulting from

Nanopierce's decision to issue equity in order to fund this lawsuit.  Last (Count

13), a control person liability claim under § 15 for misrepresentations in

Nanopierce's registration statement.

The factual basis for Counts 1, 7, 8 and 13 of Harvest Court's claims is that Nanopierce made two material misstatements in its October 20, 2000 Prospectus Supplement. First, Nanopierce failed to disclose certain facts about the background of Metzinger, one of its executives, which included a 1989 consent decree with the SEC barring him violating securities laws and from practicing before the SEC for three years. Second, Nanopierce's Prospectus notes that 10 million warrants for shares of Nanopierce stock were held by Gemini Investments and were subject to a one-year lock-up agreement where they would not be traded, when really they were held by Gemini and its subsidiaries, who ultimately exercised the warrants.

A. Metzinger's Background

This Court's 2003 decision denying Nanopierce's motion to dismiss held that although Metzinger's background was not required to be disclosed by SEC regulations, reasonable minds could differ on whether that information was nevertheless material and should have been disclosed in the interests of completeness. (Dec. 2003 Opinion, at 9). Nanopierce now contends that the consent judgment was immaterial as a matter of law, and alternatively that the omission of the information could not have caused the losses that Harvest Court suffered.

On the issue of materiality, this issue is no different than at the motion to dismiss level. This Court wrote, "to determine whether Kampmann had a duty to disclose Intercell's bankruptcy and Metzinger's consent decree depends upon whether those facts represent material information. As noted previously by this

Court, 'materiality is a mixed question of law and fact,' and 'a complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.' Accordingly, the Court declines to dismiss Harvest Court's Counterclaim on the ground that Kampmann had no duty to disclose the allegedly material information concerning Metzinger's background." <u>Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC</u>, 2003 U.S. Dist. LEXIS 21858 (S.D.N.Y. 2003) (internal citations omitted).  Accordingly, the issue of materiality should not be revisited, and the question of materiality here should go to the jury.

However, Counter-Defendants also contend that the statement about Metzinger's background was not false because they did not have "superior knowledge" of the SEC injunction.  (Counter-Def. Br. at 12).  Counter-Defendants argue that "the SEC enforcement action was readily and publicly available and would have been easily verifiable had Harvest Court performed even minimal due diligence." <u>Id.</u>  <u>See also</u> <u>Grumman Allied Inc v. Rohr Indus., Inc</u>., 748 F.2d 729, 737 (2d Cir. 1984) ("Where sophisticated businessmen, engaged in a major transaction, enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.")  Such a claim seems particularly inappropriate where, as here, a company was investing without doing any due diligence, and indeed banking on the fact that the stock would fall in price.  Accordingly, with regard to the statements in Nanopierce's prospectus regarding Metzinger's

background and SEC injunction, it is tempting to accept the argument that Harvest Court cannot be said to have reasonably relied on Nanopierce's Prospectus without any further due diligence.

However, this argument ultimately fails because Nanopierce included a misrepresentative biography of Metzinger in its Prospectus. Where a company chooses to make a disclosure, it has a "duty to make it complete and accurate." Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC, 2003 WL 22882137 at *4 (S.D.N.Y. Dec. 4, 2003); Caiola v. Citibank, 295 F.3d 312, 331 (2d Cir. 2002) ("upon choosing to speak, one must speak truthfully about material issues."). Since Nanopierce did include a biographical excerpt of Metzinger in its prospectus, Harvest Court was entitled to rely on the fact that it would be truthful and complete. Thus, Nanopierce's argument fails.


B. Gemini Warrants

Nanopierce's October 20, 2000 Prospectus Supplement reads in relevant part: "This offering includes … warrants to purchase 10,000,000 shares of our common stock (the 'Gemini warrants') to be issued directly to Gemini Investments, Ltd." (October 20, 2000 Prospectus Supplement to May 25, 2000 Registration Supplement). Harvest Court claims that this statement was materially misleading, because the warrants were actually issued to, and exercised by Gemini Investments *and* Aurora Ltd., Pisces Group Ltd., Neptune Investment Group Ltd., and Centurion Group Ltd. Nanopierce contends that these entities were disclosed in its Form 8K, which is referenced in the Prospectus as containing

"a complete description of the terms and conditions of the Investor warrants and the Gemini warrants." (Counter-claim Def. Br. at 7).

This Court's decision in 2003 relied on the argument that Nanopierce knew that the warrants were being issued to entities other than Gemini, and thus it knew that those other entities could breach the lock-up agreement. However, Nanopierce also knew that those entities were subsidiaries of Gemini, and were also bound by the lock-up agreement. In fact, the financing agreement between Gemini and Nanopierce states that Gemini and the other subsidiaries "shall collectively be referred to as Gemini" and that Gemini was "authorized to act on behalf of and bind such entities."

Thus, the ultimate question is whether Nanopierce, knowing that these other entities were bound by the lock-up agreement, made a material misstatement when it used the language "directly to Gemini" in its Prospectus. A reasonable jury could find that statement misleading, and so the jury must determine whether a reasonable investor would find that discrepancy material.

C. Loss Causation

Plaintiff also argues that Harvest Court has not demonstrated any specific amount of damages with respect to both these misrepresentations, and thus Harvest Court's counterclaim should be dismissed. Harvest Court contends that Section 11 of the Securities Act contains a measure of damages, which is "the difference between the amount paid for the security, and the value thereof as of the time the suit was brought, or the price at which such security shall have been

disposed of after the suit is brought but before judgment." 15 U.S.C. §77(k)(e).

Assuming that a jury finds that Harvest Court would not have invested in

Nanopierce but for its reliance on these misstatements, it would be entitled to

damages based on this calculation. Accordingly, Harvest Court's claim cannot be

dismissed for lack of a damages calculation.


D. Breach of Fiduciary Duty

Finally, Nanopierce asserts that it is entitled to summary judgment on

Harvest Court's breach of fiduciary duty claim, which alleges that Nanopierce

improperly offered stock to finance the current litigation, which decreased

Nanopierce's stock price and diluted the value of its shares.

Nanopierce argues that Harvest Court's claim is essentially a derivative

claim on behalf of the corporation. In that case, it argues that the claim must fail

because Harvest Court did not allege that it presented the issue to Nanopierce's

board of directors, nor did it plead demand futility.[7]  Harvest Court argues that

under Nevada law, directors owe fiduciary duties "directly to their company's

shareholders as well as to the company itself." (Counter-Pl. Br. at 20).

Accordingly, shareholders "have standing to seek relief from direct injuries that

are independent of any injury suffered by the corporation." Cohen v. Mirage

Records, Inc., 62 P.3d 720, 732 (Nev. 2003).  However, the case that Harvest

Court cites is in the context of shareholders contesting a merger, in which their

shares were automatically converted into shares of the new, merged company.  Id.

("The Model Act limits the ability of minority shareholders to challenge a merger.

---

[7] Both parties agree that Nevada corporate law governs this issue.

18

Under the Model Act, minority shareholders are no longer able to enjoin a merger simply because they disagree with the majority's decision. Instead, minority shareholders are limited to dissenting to the merger and seeking an independent evaluation of the fair value of their stock."). The Court considered the fact that Nevada statutes provide for certain circumstances where dissenting shareholders can sue to enjoin a merger, such as when the merger itself is unlawful. Id. at 727. To generalize that principle into the creation of a private right of action for every business decision that results in a change in the company's stock price would essentially make derivative claims unnecessary. Accordingly, Harvest Court's claim fails here because it did not properly allege the requirements to bring a derivative suit, and its claim cannot proceed on any other basis.


**IV. Defendant H. Glenn Bagwell's Motion for Summary Judgment**

Finally, defendant Bagwell, an attorney for Gemini Investments, moves for summary judgment on all of the claims against him. He proposes two theories under which he is not liable. First, he argues that the breach of the lock-up agreement did not cause Harvest Court's damages, since it was Nanopierce's failure to issue the reset shares that caused Harvest Court's loss. Second, he argues that Harvest Court cannot demonstrate that it relied on the lock-up agreement in entering into the stock purchase or that it was a material term to that agreement. Because both of these issues are questions for the jury to decide, and thus summary judgment on Bagwell's claims is denied.

As described in this Court's decision denying Bagwell's motion to dismiss, the Complaint alleges the following facts:

> Roughly ten months prior to the purchase of NPCT shares by Harvest Court in the Stock Purchase Agreement, NPCT had issued warrants enabling Gemini Investments, Ltd. ("Gemini") and another entity to purchase 10 million NPCT shares at $ 0.51 per share, warrants that "became eligible for cashless exercise as early as December 2000." (Am. Countercls. at 18 P66.) It is alleged on information and belief that Gemini and NPCT were related entities, and this warrant issuance was actually part of a scheme whereby the shares of NPCT stock were to be "transferred by Gemini to other NPCT insiders, related entities and friends so that the shares could be dumped covertly into the market and sold in violation of the agreements with Harvest Court as well as applicable laws and SEC regulations." (Am. Countercls. at 18-19 P67.)

> Harvest Court was concerned about possible dilution of the shares it would receive in the Stock Purchase Agreement by the exercise of Gemini's warrants and sale of the corresponding stock (the "Gemini Warrant shares"). To guard against this, when NPCT and Harvest Court entered into the [Stock Purchase Agreement], Harvest Court insisted that the Gemini Warrant shares be subject to a one-year lock-up period during which they could not be sold…. This Lock-up Agreement between NPCT and Gemini, it is explicitly alleged, "was intended to benefit Harvest Court by preventing dilution of its NPCT shares." (Am. Countercls. at P68.)

Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC, 2004 U.S. Dist. LEXIS 24168, *9-12 (S.D.N.Y. 2004). Further, the Complaint alleges that NPCT did not disclose to Harvest Court "that Bagwell was an insider of and an attorney for both NPCT and Gemini and that he was to receive a large portion of the Gemini warrant shares for his own account." Id.

Bagwell's motion for summary judgment contends that if the Court finds that there was a breach of the lock-up agreement, discussed above, his breach of the lock-up agreement did not cause Harvest Court's damages. First, Bagwell argues that Harvest Court did not rely on the lock-up agreement because the lock-

up agreement is not referenced in the Purchase Agreement, and because Harvest

Court's 30(b)(6) witness denied knowledge of the lock-up agreement.  However,

Harvest Court notes that Metzinger, Nanopierce's CEO, testified that during

negotiations, Harvest Court "demand[ed]" the lock-up agreement.  (Counter-Pl.

Br. at 3).  Metzinger also testified that the lock-up agreement and escrow

agreement were "material" to the financing.  Id.  Richards, Nanopierce's CFO,

also testified that Harvest Court "wanted" the lock-up agreement and that it was a

"requirement."  Id.  Further, the lock-up agreement itself provides that it was

drafted "as a result of requirements made by the financial institution providing

financing to Nanopierce."  Clearly the parties dispute whether Harvest Court

considered the agreement material; accordingly, the issue of Harvest Court's

reliance on the lock-up agreement must be decided by the jury.

Second, Bagwell argues that his breach of the lock-up agreement did not

cause Harvest Court's damages, since those damages were caused by

Nanopierce's failure to issue the reset shares.  In a 2002 motion to dismiss

opinion on this issue, the Court noted, "if Bagwell's misrepresentations were a

material factor in Harvest Court's decision to invest in NPCT, and Harvest

Court's shares of NPCT were diluted by the violations of the Lock-Up Agreement

that Bagwell facilitated after agreeing to act as escrow agent, then it would follow

that Harvest Court was damaged by Bagwell's misrepresentations, in that it

suffered from unanticipated dilution of its NPCT shares that it relied upon

Bagwell to prevent as he had promised to do."  Nanopierce Techs., Inc. v.

Southridge Capital Mgmt. LLC, 2004 U.S. Dist. LEXIS 24168, *29-30 (S.D.N.Y.

2004).  This analysis does not change when considered on a motion for summary judgment.  Since the lock-up agreement could be found by a reasonable jury to have been a material factor in Harvest Court's decision to invest in Nanopierce, the breach of the lock-up agreement can be said to have caused at least a portion of Harvest Court's damages.

Finally, Bagwell's motion for summary judgment on the breach of contract relies on the same loss causation assertion he makes in support of his 10(b)(5) claims, and should be denied for the same reasons.  Thus, Bagwell's motion for summary judgment should be denied on all counts.[8]

## V. Conclusion

For the reasons described above, Defendant Harvest Court's motion for summary judgment is GRANTED.  Counterclaim-Defendants Kampmann and Metzinger's motion for summary judgment is GRANTED in part and DENIED in part.  The motion is DENIED with respect to Counts 1, 7, 8, and 13, and the motion is GRANTED with respect to Count 9.  Finally, Counterclaim-Defendant Bagwell's motion for summary judgment is DENIED.

The parties whose causes of action survive this motion are to advise the Court in writing on or before March 3, 2008, when and how they wish to proceed with respect to the remaining claims.

---

[8] The facts required to defeat summary judgment on the 10(b)(5) claims will also defeat summary judgment on counter-plaintiff's common law fraud claims.  Thus, summary judgment should be denied as to those claims as well.

**SO ORDERED.**

Dated:  January 28, 2008
        New York, NY

U.S.D.J.